**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | | |
| | ) | |
| | ) | |
| **Vs.** | ) | **CR 1:26-cr-00006-MRD-AEM** |
| | ) | |
| **PATRICK DALLAS** | ) | |

## PATRICK DALLAS SENTENCING MEMORANDUM

Mr. Patrick Dallas will appear before the Court for sentencing on August 12, 2026. He has pleaded guilty to Count 1: Conspiracy to Commit mail fraud, 18 U.S.C. § 1349, - 20 years of imprisonment, a fine of $250,000, a term of supervised release of 3 years, and a mandatory special assessment of $100 and conspiracy to commit money laundering 18 U/S/C/1956(h), 20 years of imprisonment, a fine of $250,000, a term of supervised release of 3 years, and a mandatory special assessment of $100. The presentence report (PSR) calculates an advisory prison sentence of 30 months to 37 months, imprisonment. Mr. Dallas states that probation is technically correct in their guideline calculation for money laundering. The defendant has a "policy" argument as it applies to USSG 2S1.1(b)2(B). The Base offense guideline for money laundering is 19 Then in what can only be considered as double counting, everyone convicted of money laundering automatically get a 2-level enhancement which then equals an adjusted base offense level 21 – 3 points for acceptance equals adjusted base offense level 18. If not for the doble counting his adjusted base offense level would be 16. The court should grant a variance on this adjustment as nothing more than double counting for the same offense. Mr. Dallas is requesting a sentence of time served, with no supervised release and no restitution, as he will be deported once his sentence is completed.

The defendant was born Patrick Nicholas Dallas on January 19, 1988, in Linstead, Jamaica, West Indies, to the non-marital union of Jacqueline Brown and a man whose name is not known to the defendant. According to ICE records and records maintained by the Office of the New York City Clerk, the defendant's father's first name is Winston (it is assumed the

defendant's father's last name is Dallas, though that is unclear). The defendant's mother died unexpectedly six months after the defendant's birth. She was 21 years of age. The defendant was told that her death was the result of high blood pressure, but he acknowledged that the "whole story" of her passing was never elucidated. The defendant's father reportedly "disappeared" when the defendant's mother passed away, and the defendant never had any communication with him thereafter. The defendant was told that his father was deceased.

After his mother's demise and his father's disappearance, the defendant was raised by his maternal aunt, Sharon Green and her husband Ainsworth Green in St. Ann, Jamaica, West Indies. The defendant views Mr. and Mrs. Green not as his aunt and uncle but as his parents and indicates that he has always been very close to them. Mr. and Mrs. Green divorced in approximately 2010 because the two "grew apart," Mrs. Green, now approximately age 62, subsequently relocated to Toronto, Canada, and she continues to reside there, having acquired citizenship in that county. She remains single and holds employment as a caregiver in the healthcare industry. Mr. Green, approximately age 72, is a lifelong resident of Jamaica, West Indies. He is retired and living with his second wife of approximately ten years, Norma Green, a store manager in her mid-40s.

The defendant is the only offspring produced by his biological parents' union. He has a maternal half-sister named Nadesha Black, age 42, who is married without children, lives in Queens, New York, and works as a hotel manager. The defendant did not grow up with Ms. Black, as she was primarily raised by her father and her father's family; however, they do currently communicate regularly and have a harmonious relationship.

The defendant views his cousins Patricia Green, age 43, and Kimberly Green, age 37, who are the children of Sharon and Ainsworth Green, as his siblings since he was raised with them. Patricia Green is married one with one child. Kimberly Green is retired from the United States Army, and currently lives in Killeen, Texas. Patricia Green, age 43, is married with one child, resides in an unspecified city in New Jersey, and is employed as a college professor, The defendant also views Alyssa Green, age 12, who is the only offspring of Ainsworth and Norma

Green as his sister, she attends school and resides with Ainsworth and Norma Green in Jamaica, West Indies. The defendant described close bonds with all the individuals named.

The defendant was raised by his maternal aunt and uncle. The family, including the aunt and uncle's two children, lived in a house in St. Ann, Jamaica, West Indies. The defendant indicated that the family enjoyed upper-middle-income living conditions. The uncle worked in management at Dunn's River Falls & Park, Jamaica's largest tourist attraction, The aunt worked as a photographer/videographer. The aunt and uncle also owned income-producing investment properties. Money was "never an issue," and in that respect, the defendant considered himself to be "one of the fortunate kids" in his childhood community. Nevertheless, the defendant was a self-described "bad child," in that he routinely misbehaved during his preteen years. In hindsight, the defendant does not know why he misbehaved, but he senses that his recalcitrance at that time may have been a product of his biological parents' absence from his life and the resentment it caused him to feel. Due to his admitted misbehavior, the defendant was routinely subjected to corporal punishment both at home and at school. In fact, he recalled being struck by various objects, including shoes and pieces of wood. He recounted at least one of the beatings as having caused noticeable injuries, such as getting his head slammed into the wall causing bleeding. He would get hit with electrical wires, pieces of wood, whatever his parents could get their hands on. His siblings would get beat as well but not as bad, in his opinion. The defendant states, such punishment by both parents, guardians and school officials was commonplace and accepted in Jamaica "when children do not listen" to their elders. Therefore, he never felt “abused’. According to the defendant, his behavior both at home and school improved dramatically when he became a teenager. Resultantly, the beatings stopped. Despite being subjected to the beatings as a child, the defendant has always appreciated his aunt and uncle for raising him and supporting him in the absence of his biological parents. He remembers a childhood full of many happy moments, vacations and his father taking him to the golf course.

In the beginning of his schooling, he did not do well and consequently he repeated the 8th grade. After the completion of the 8th grade, his parents took him for psychological counseling for 6 months. He then really started to turn his life around beginning with the 9th grade and started doing very well in school. He finished 3rd in his class in 9th grade. As a comparison he finished

2nd to last in 8th grade. He began to realize if he put his mind to it, he could succeed in life. He graduated from college in 2007 and began an accelerated program in grad school for information technology, "IT", which he graduated in August 2011.

In 2011, the defendant initially, used a tourist visa to visit his then-girlfriend Tiffany Thompson as well as friends and family members in the United States. Mr. Dallas did not plan to stay in the United States long-term, he did so, thereby overstaying the visa. Several months later, on February 10, 2012, the defendant married Ms. Thompson in the Kew Gardens section of Queens, New York, causing him to overstay his visa. He and Ms. Thompson were young and in love and believed the marriage would last forever. His parents although they did not go to his wedding in the United States, were very supportive. His father just did not like the cold weather and did not want to go to the United States for the wedding. He thereafter applied for permanent residency status, which was granted on June 21, 2013. The defendant advised that during the marriage, he and his wife generally lived apart, as she is from Hartford, Connecticut, and she preferred to remain in that area, near to her family, while the defendant chose to live in the New York City/Long Island area because he secured employment there. According to the defendant, they did reside together briefly, but they "butted heads" during that time predominantly due to the wife's "messiness." Ultimately, they separated in 2015 and divorced in 2016. The marriage produced no children. They have had no contact since the divorce, and Mr. Dallas has no other information about his former wife, age 33, though he was told that she may be remarried with children.

The defendant continued living in New York until late 2017 when he relocated to Atlanta, Georgia. In 2018, the defendant commenced a romantic relationship with Anne Bertrac, and the two began living together soon thereafter. The defendant averred that their relationship was strong until May 2020. He explained that at that time, he discovered Ms. Bertrac was in a sexual relationship with another man. The defendant indicated that his romance with Ms. Bertrac essentially ended at that time, though they continued living together and "messing around" occasionally. In fact, several months after Ms. Bertrac was "caught cheating," she conceived the defendant's only child, a daughter named Leana Dallas, who was born on April 15, 2021. The defendant stated that he lived apart from Ms. Bertrac and their child for an extended period after

the child was born, though he spent time with the child regularly and supported Ms. Bertrac and the child financially without being court-ordered to do so. In February 2024, the defendant resumed living with Ms. Bertrac and the child after the lease on his apartment expired. The defendant explained that he has a first-floor bedroom, while Ms. Bertrac and the child utilize a second-floor bedroom. The three share the kitchen, living room, and other common areas of the residence and are said to coexist harmoniously. According to the defendant, he was responsible for the lion's share of the household expenses. The defendant stated that Ms. Bertrac, age 29, operates an "online business," but the defendant is unaware of the business or the amount of income it generates. Mr. Dallas and Ms. Bertrac were living together at 4034 Hancock circle, Atlanta Georgia at the time of his arrest.

Mr. Dallas moved to Atlanta Georgia on his own. He moved to Atlanta due to the warm climate, parks, trees suburbs rather than the congestion of New York City. Mr. Dallas has worked at various jobs including Buffalo wild wings as a manger, Uber driver, automobile business, restaurateur and consultant. Mr. Dallas has always worked hard since entering the United States in 2011. Mr. Dallas started working at an auto repair shop and learned enough that he started his own company and employed 8 people. He also started his own consulting firm and restaurant.

Mr. Dallas's reason for coming to the Unites States, was to experience the American dream and to earn enough money legally to support himself and his family and to one day purchase a home for he, his wife and child. When he came to the United States, he first resided in New York and was working in restaurants earning $39,000 per year. He left New York and moved to Atlanta Georgia where he was able to increase his earnings to $55,000 per year as an Uber Driver. He then continued to work hard and figured out a means to earn more money. Subsequently opened his own automobile shop, making $185,000 per year. In addition, he opened his own Jamaican restaurant in 2022, with gross sales in the first year of $1,900,000. Mr. Dallas was ambitious and hardworking; however, he overextended himself. His co-defendant approached him with a business proposal. He did not put much thought into the proposal as he was stressed by his restaurant opening date and was juggling a lot of differences in interests at the same time. He then made a fateful decision to launder the money and for that he will pay dearly.

He now wishes he made a better choice. His choice to commit this crime will cost him dearly. He now looks back and realized he was so narrow-minded and did not consider the alternatives or the consequences of his decisions. Mr. Dallas now realizes that the consequences of committing a crime for a person who is not a United States citizen is catastrophic. This decision that he made will be a life-changing event for him. The most serious punishment, the court will not pronounce. The most serious penalty, deportation is for life and the dreams of financial stability gone.

As with all people convicted of crimes, who are not United States citizens, the harshest punishment is deportation. Mr. Dallas he will spend his life in Jamaica and abandon the dream that he had of a better life in the United States, all because of poor decisions he made. Incarceration will be temporary no matter what sentence he receives. The loss of opportunity and family is permanent. Mr. Dallas will not watch his child grow up. As Ms. Bertrac stated in her letter to the Court Mr. Dallas by all accounts is a great father to his child. His child misses him dearly. The penalty of deportation is akin to a life sentence of estrangement from your loved ones. Mr. Dallas understands that what he did was wrong. Mr. Dallas does not need a lengthy sentence to punish him for what he has done. At some level of imprisonment, it becomes counterproductive and purely punitive in nature and does not serve any real societal goals as to general deterrence or individual deterrence. All too often in the criminal justice system we tend to throw out numbers in sentencing, perhaps truly not understanding that the numbers mean something. For instance, for every year Mr. Dallas is incarcerated that is 365 days without the ability to find meaningful employment, to be away from his family, including his child**.** A sentence of 20 months (time served) translates to 620 days away from family and friends, certainly not an insignificant number. Mr. Dallas, who is motivated to change, does not need any more than 620 lonely, isolated potentially violent days to think about what his conduct has cost him by way of freedom and loss of family and work opportunities and how to adjust and change his life around. Mr. Dallas is asking that he be sentenced to time served, no supervised release, given that he will be deported with no restitution.

In a speech given at the 2003 American Bar Association Annual Meeting, Supreme Court Justice Anthony Kennedy delivered the keynote address, challenging the legal profession and the ABA to begin a new public discussion about American sentencing and corrections policies and practices. In discussing the problems plaguing our present criminal justice system, he stated:

Our resources are misspent, our punishments too severe, our sentences too long.

Justice Kennedy also stated candidly that "every day in prison is much longer than most any day you have ever spent." In response to Justice' Kennedy's comments, the Justice Kennedy Commission was formed in 2004, which set forth the following recommendations in its report to the United States House of Representatives:

Lengthy periods of incarceration should be reserved for offenders who pose the greatest danger to the community and who commit the most serious offenses

Alternatives to incarceration should be provided when offenders pose a minimal risk to the community and appear likely to benefit from rehabilitation efforts.

The Courts since 2004 have refined sentencing. However, we still imprison people with lengthy unwarranted sentences at times. Although public safety is a major public concern, the public also believes in rehabilitation. In a recent nationwide survey conducted by the National Center for State Courts, almost eighty percent (80%) of 1,502 people surveyed believed that under the right conditions, many offenders can turn their lives around and become productive, law-abiding citizens.

As Bryan Stevenson, founder and Executive Director of the Equal Justice Initiative stated, “I believe that each person is more than the worst thing they've ever done,” we should not define someone just based on that act. Stevenson notes that we are all broken in one way or another, and understanding our brokenness creates not only a need and desire for mercy, but also a corresponding need to show mercy. Mr. Dallas asks that this Court show him some mercy and understand that he is truly better than the worst things he has done in his life.

He is 38 years old. Mr. Dallas appears to me to be a very articulate and intelligent and hardworking person, who started at least two businesses and clearly is remorseful. I no doubt believe that if he is motivated, he will be successful at whatever he does in Jamaica, although his

options will be limited. The Court has reviewed his character letters that were submitted by people who know Mr. Dallas and they speak of a hardworking, kind, thoughtful person and a good family man. He has redeeming qualities.

Mr. Dallas requests, of the Court, when considering sentencing him that the Court factor in, his young family, the collateral consequences of the conviction (deportation), in the Court's decision, as to what is sufficient but not greater than necessary. Mr. Dallas would ask the court to sentence him to a sentence of time served, no supervised release, and no restitution.

Enclosed. please find a letter that Mr. Dallas wrote to the Court, as well as numerous support letters.

Respectfully submitted,
Patrick Dallas
By his Attorney,

/s/ Terence Livingston
Terence Livingston, Esq.
996 Smith Street
Providence, RI 02903
(401) 861-8121

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of August 2026 a copy of the within Sentencing Memorandum was filed electronically and is available for viewing and downloading from the ECF system.

Electronic Notification:

John McAdams
Assistant United States Attorney
US Attorney's Office
One Financial Plaza
17th floor
Providence, RI 02903